

**SIGNED this 29th day of June, 2012.**

_____
**LEIF M. CLARK
UNITED STATES BANKRUPTCY JUDGE**

_____

# United States Bankruptcy Court

Western District of Texas
San Antonio Division

| | |
|---|---|
| *In re* | BANKR. CASE NO. |
| JOHN KRZYSZTOF WALD | 11-53644 |
| *Debtor* | |
| HOLLY HORRIGAN  *Plaintiff,*  v.  JOHN KRZYSZTOF WALD  *Defendant.* | ADV. NO. 12-05008 |

**MEMORANDUM DECISION DENYING MOTION TO DISMISS**

     The Defendant/Debtor Wald seeks to dismiss the adversary complaint filed against him pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. The Amended Complaint, filed on April 9, 2012, seeks both a determination of the dischargeability of debt and denial of Wald's discharge.

1

1. **The Amended Complaint**

The underlying facts include the following:

The Plaintiff, Ms. Horrigan, and the Defendant developed a patent together for limit order technology through a corporation known as Pendleton Trading Systems ("Pendleton"). In January, 2001, Pendleton, Horrigan and Wald entered into a Stock Redemption Agreement whereby Horrigan was to receive a percentage of Pendleton's "Gross Revenues."

In March, 2004, Pendleton filed suit against Investment Technology Group, Inc. alleging patent infringement and unfair competition. This suit was settled in 2005 for payment of $600,000 to Pendleton and payment of $500,000 to Pendleton's attorneys. Wald received $300,000 from the settlement proceeds and Horrigan received $150,000. Horrigan asserts that another attorney (one who was not involved in the Investment Technology lawsuit) received a payment in the amount of $75,000.

In November, 2005, Horrigan filed suit against Pendleton and Wald in the United States District Court for the Southern District of New York for breach of the Stock Redemption Agreement (the "New York Suit"). The New York Suit alleged claims for breach of contract and breach of the covenant of good faith and fair dealing, but the district court dismissed the breach of the covenant of good faith and fair dealing claim as duplicative of the breach of contract claim. In her breach of contract claim, Horrigan argued that the term "Gross Revenues" included the entire settlement amount of $1.1 million, not just the $600,000 paid directly to Pendleton.

In June, 2006, Wald purchased a residence in San Antonio, Texas. Horrigan states that Wald made a down payment of approximately $30,000 and spent approximately $65,000 on repairs and renovations. Horrigan believes that the balance of the purchase price ($300,000) was provided by Wald's mother. On exchange, Wald executed a note a deed of trust in favor of his mother. Horrigan states that Wald informed Horrigan that, out of the $300,000 Wald received from Pendleton, he used half of it to pay taxes, used $95,000 to purchase and renovate the San Antonio home, and gave the remainder of the funds to his wife.

During their marriage, Wald and his wife kept joint checking and savings accounts at Chase Bank. Mrs. Wald also kept a separate account in her name at Vanguard. From time to time, Horrigan asserts that Mrs. Wald would remove funds from the Walds' joint savings account and transfer them to her individual account at Vanguard.

In December, 2009, the district court for the Southern District of New York granted partial summary judgment in favor Horrigan. The court found that the term "Gross Revenues" unambiguously included the entirety of the technology-related litigation settlements (i.e. $1.1

2

million as opposed to the $600,000 that was paid directly to Pendleton). Accordingly, the court found that Horrigan's royalty amount had to be calculated before any deductions for attorneys' fees. The court concluded that Horrigan was entitled to a royalty payment corresponding to 25% of the $1.1 million in "Gross Revenues" that Pendleton generated from the 2005 patent litigation. The court did not actually enter an order of partial final judgment against Wald and Pendleton until August, 2011. At that time, the court entered judgment against Wald and Pendleton in the amount of $125,000 plus interest and costs.

In February, 2011, Wald allegedly consulted a bankruptcy attorney in San Antonio about the possibility of filing for bankruptcy protection. In May, 2011, Wald's mother passed away and Wald became the primary beneficiary of a trust created by his mother's will. The trust is subject to a spendthrift provision, and provides that the trustee may make discretionary distributions to the debtor for "health, education, support and maintenance." Additionally, the trust provides that the trustee may "pay or apply, in the Trustee's sole discretion, all current net income of each beneficiary's share to him or her." The trust further provides that if the trustee determines that the income of any beneficiary is not sufficient for his/her health, education, support and maintenance, "the Trustee may pay to him or apply for his or her benefit, so much of the principal of his or her share as the Trustee in its sole discretion determines to be reasonable for those purposes." Finally, the trust provides that "[w]hen John Wald shall have attained the age of sixty (60) years, the Trustee shall distribute to [sic] his or her trust share, outright and free of trust."

In June, 2011, Wald and his wife separated. Mrs. Wald filed for divorce in July, 2011. Horrigan states that no temporary orders for alimony, support or maintenance have been entered in the divorce case to date.

Horrigan asserts that in August, 2011, Wald withdrew $800.00 from the Walds' joint account at Chase Bank. Horrigan states that Wald then requested that his name be removed from the accounts at Chase. After the removal of the $800, $15,538.41 remained in the checking account and $2,491.23 remained in the savings account. Horrigan further asserts that on October 8, 2011, Wald made a payment of $3,000 to Mrs. Wald.

Wald filed for chapter 7 on October 20, 2011, at which time Wald also filed schedules, a statement of financial affairs and a Form B22A, which he amended in December, 2011.

Horrigan maintains that Wald's conduct in connection with the New York Suit warrants denying his discharge under sections 727(a)(2), (a)(4) and (a)(5), and deeming any debt owed to Horrigan non-dischargeable pursuant to sections 523(a)(2) and (a)(6).

3

Specifically, with respect to the section 523 claims, Horrigan contends that 1) in the Settlement Agreement with Investment Technology Group, Wald represented that the gross proceeds to received by Pendleton was $600,000 when the actual amount received was $1,100,000; 2) as the person who negotiated the agreement, Wald knew that this representation was false; 3) Wald made the representation with the intent to deceive Horrigan with regard to her share of the settlement proceeds; 4) Horrigan justifiably relied upon Wald's false representations because she did not immediately take action to block the transaction and prevent the dissipation of the funds; and 5) Horrigan suffered damages as shown by the fact that both Wald and Pendleton have filed for chapter 7 bankruptcy without sufficient assets to satisfy Horrigan's claim. Horrigan maintains that these allegations, if proved at trial, justify a determination that Wald's debt to Horrigan is non-dischargeable under sections 523(a)(2).

Horrigan also states that Wald's debt to Horrigan should be deemed non-dischargeable under section 523(a)(6) because "Wald committed willful and malicious injury against Horrigan when he misrepresented the amount received under the settlement and caused the excess proceeds owing to Horrigan to be dissipated by Pendleton and by himself." Horrigan asserts that "[i]n placing such funds beyond the reach of Horrigan, Wald either acted with actual intent to harm Horrigan and/or committed an act which was substantially certain to result in harm to Horrigan."

Regarding the section 727 claims, Horrigan asserts that Wald's discharge should be denied under section 727(a)(2) because, during the year prior to filing for bankruptcy, Wald "permitted his spouse to remove funds constituting his property to an account under her sole control" – namely $10,000 on January 7, 2011 and another $10,000 on March 23, 2011. Horrigan further asserts that Wald transferred property to his spouse in August, 2011 when he caused his name to be removed from the couple's joint checking and savings accounts at a time when those accounts contained over $18,000. Finally, Horrigan asserts that Wald transferred $3,000 to Mrs. Wald in October, 2011. Horrigan states that Wald carried out these transfers with intent to hinder, delay or defraud Horrigan. She further asserts that such intent can be shown by the fact that the transfers were made to an insider for no reasonably equivalent consideration at a time when Wald was insolvent and being sued by Horrigan.

Horrigan also maintains that Wald concealed property belonging to him when he filed for bankruptcy and failed to disclose that his spouse was holding funds consisting of transfers from their joint accounts. Horrigan states that the funds contained in the Walds' joint accounts constituted community property, and that as of January 1, 2011, Mrs. Wald held $61,263.99 in her individual account.

Regarding Ms. Horrigan's section 727(a)(4) claim, she asserts that Wald made the following false statements in his schedules and statement of financial affairs:

4

(a) On page 2 of the Petition, he stated that there were no pending cases of any affiliate of the Debtor. In fact, the bankruptcy of Pendleton was pending in the United States Bankruptcy Court for the Western District of Texas.

(b) On Schedule A, the Debtor stated that he owned only a one-half interest in his homestead. In fact, he was the sole party named on the deed.

(c) On Schedule B2, the debtor listed two bank accounts totaling less than $200. He did not disclose his interest in accounts held by Storm Wald.

(d) On Schedule B13, he stated that he owned no interests in incorporated or unincorporated businesses. In fact, he owned the stock of Pendleton.

(e) On Schedule B20, he stated that he did not have any interests in the estate of a decedent or a trust. In fact, he was the primary beneficiary of a trust created by his mother.

(f) On Schedule B25, he listed only a 2002 Honda Civic. He failed to list his interest in a 2005 Toyota Sienna.

(g) The debtor failed to disclose his interest in a deferred compensation account pursuant to his employment with the University of Texas at San Antonio.

(h) On Statement of Financial Affairs question 3(a), he stated that the only payments made to creditors during the 90 days prior to bankruptcy were "None other than in the course of ordinary business." In fact, he had made a double mortgage payment to his mother's estate, had made credit card payments of approximately $2,000 per month, had made a $3,000 payment to Storm Wald, and a payment of $15,000 to Chase Bank.

(i) On questions 7 and 10 of the Statement of Financial Affairs, the Debtor stated that he had not made any gifts or transfers within the year prior to bankruptcy and the two years prior to bankruptcy respectively. In fact, he had made transfers to Storm Wald of $10,000.00, $10,000.00, $18,029.64 and $3,000.00 as set forth above.

(j) On question 11 of the Statement of Financial Affairs, he stated that the amount remaining in the Chase accounts when he removed his name from such accounts was $750.00. In fact, the amount in such accounts was $18,029.64.

Horrigan further states that Wald made the following false oaths in his amended Form B22A, filed in December, 2011:

>   (a) On Line 22A, he stated that he had vehicle operating expenses for 2 or more vehicles, when he only operated one vehicle.
>
>   (b) On Lines 23 and 24, he claimed ownership expenses for two vehicles, when he had no vehicle ownership expenses.
>
>   (c) On Line 30, he claimed $420.00 in childcare expenses, when he did not incur any actual expenses for items such as babysitting, day care, nursery and preschool.
>
>   (d) On Line 34A, he listed health insurance costs of $1,230.73. However, on Schedule J, he listed his expenses for health insurance at $0.
>
>   (e) On Line 38, he listed education expenses of $266.67 despite the fact that his children attend public school and do not incur such expenses.

Horrigan contends that the cumulative effect of knowingly and falsely listing these improper expenses "was to inflate his expenses by at least $2,909.40 per month and to understate his projected disposable income by $174,564.00.

Finally, regarding Horrigan's section 727(a)(5) claim, she states that "[a]s of January 1, 2011, Storm Wald was holding funds belonging to the Debtor in the amount of $61,263.99 in her individual account. At least $20,000.00 in additional funds were transferred during 2011." Horrigan argues that "[u]nless the debtor can satisfactorily explain the loss of these funds totaling $81,263.99, his discharge must be denied."

### 2. The Motion to Dismiss

Wald maintains that Horrigan's Amended Complaint should be dismissed for failure to state a claim under Rule 12(b)(6). Regarding the Section 523(a)(2) claim, Wald asserts that Horrigan failed to allege fraud with the requisite particularity. Specifically, Wald asserts that Horrigan's Amended Complaint "fails to allege that Plaintiff relied upon the alleged false representation: 'the settlement proceeds were $600,000 as opposed to $1.1M." Wald relies on findings and conclusions from the New York District Court in support of his argument that Wald never made a false representation to Horrigan and that Horrigan never relied on the representation that the settlement proceeds were $600,000 as opposed to $1.1 million. Finally, Wald argues that *res judicata* and collateral estoppel bar Horrigan's section 523(a)(2)(A) claim

6

because it is based on the same operative facts as the New York litigation, where the court found only a breach of contract had occurred.

Regarding Horrigan's section 523(a)(6) claim, Wald asserts that Horrigan must plead her "misrepresentation" claim with particularity under Rule 9(b). He further asserts that the allegations in the Amended Complaint simply do not rise to the level of willful and malicious injury. Wald maintains that Horrigan cannot and has not alleged that the settlement proceeds were, at the time of the settlement, Horrigan's property. He maintains that any payments made to an attorney from the settlement proceeds could not have constituted willful and malicious injury to the property of Horrigan.

Finally, Wald argues that the section 727 claims also must be dismissed for failure to state a claim. Wald relies on the depositions of himself and his ex-wife to refute the truth of Horrigan's section 727 allegations. Wald's arguments with respect to Horrigan's section 727 claims represent the epitome of a factual dispute best reserved for trial.[1] This court has not and will not (for the reasons explained more fully below) take judicial notice of the depositions attached to Wald's motion to dismiss. Accordingly, the court will not dismiss Horrigan's section 727 claims based on factual assertions found in those depositions that purportedly contradict Horrigan's allegations.

*Discussion*

1. Standards for Rule 12(b)(6) Motion to Dismiss

The Supreme Court has said that Rule 8(a)(2) of the Federal Rules of Civil Procedure "requires only a short and plain statement of the claim showing that the pleader is entitled to relief in order to give the defendant fair notice of what the claim is and the grounds upon which it rests[.]" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotations and citation omitted). When such a complaint is attacked under Rule 12(b)(6), the plaintiff is obligated, with regard to the grounds upon which the complaint rests, to furnish more than labels and conclusions. "[A] formulaic recitation of the elements of the cause of action will not do[.]" *Id.*; *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (stating that conclusory factual allegations, formulaic or threadbare recitations of the elements of a claim, and bare legal conclusions are not presumed to be true). "Factual allegations must be enough to raise a right to relief above the speculative level," and must do more than simply create a "suspicion of a legally cognizable right of action." *Twombly*, 550 U.S. at 555 (citing 5 C. Wright & A. Miller, FED. PRAC. AND PROC. § 1216, pp. 235-236 (3d ed. 2004)). Nonetheless, in reviewing a 12(b)(6)

---

[1] Wald states that he intends to bring a motion for summary judgment later in these proceedings, but as Wald's defensive arguments rely entirely on facts, which are likely disputed by Horrigan, a motion for summary would likely fail as well.

7

motion, the court must accept all well-pleaded facts as true. *Broyles v. State ex. rel. Abbott*, 2010 U.S. App. LEXIS 12151, at *5 (5th Cir. 2010).

On a motion to dismiss, the court may properly consider the documents attached to or incorporated by reference in the Plaintiff's complaint, facts of which judicial notice may be taken, and matters of public record. *See, e.g., U.S. ex rel. Willard v. Humana Health Plan of Tex., Inc.*, 336 F.3d 375, 379 (5th Cir. 2003) (citing *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017-18 (5th Cir. 1996)); *Cinnel v. Connick*, 15 F.3d 1338, 1343 (5th Cir. 1994). Here, no documents are attached to or incorporated by reference into the Complaint. However, attached to the Defendants' Motion to Dismiss are several court filings from the Southern District of New York as well as two depositions taken in the New York suit. The pleadings filed and decisions issued in the New York case are matters of public record of which the court may (and hereby does) take judicial notice. The depositions, however, are neither matters of public record, nor facts of which the court may take judicial notice. *See Kaye v. Lone Star Fund V (U.S.), L.P.*, 453 B.R. 645, 664-665 (N.D. Tex. 2011) ("When a court takes judicial notice of public documents or documents from another court, it may only take notice of the undisputed facts therein, which do not include the 'facts' asserted in various affidavits and depositions."); *Anderson v. Dallas County*, 2007 U.S. Dist. LEXIS 28702, at *11-12 (N.D. Tex. 2007) (refusing to take judicial notice of, among other things, deposition transcripts from another litigation, and stating that "the myriad of 'facts' contained in these documents are neither generally known nor reasonably indisputable," and thus "do not fall within the meaning of Rule 201).

Under Rule 12(d), "[i]f, on a motion under Rule 12(b)(6) …, matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." FED. R. CIV. P. 12(d). Here, discovery has not yet been completed begun, so it would be inappropriate for the court to address Horrigan's claims on summary judgment. Because the court will view Wald's Motion to Dismiss as a motion to dismiss rather than a summary judgment motion, the court will disregard the depositions attached to the Motion to Dismiss. These documents were not attached to the Amended Complaint, are not matters of public record, and do not constitute undisputed facts capable of being judicially noticed. *See Tronox Inc. v. Anadarko Petroleum Corp. (In re Tronox Inc.)*, 429 B.R. 73, 98 (Bankr. S.D.N.Y. 2010) (refusing to consider documents relied upon by the defendants in their motion to dismiss where the documents were not incorporated into the complaint).

  2. 11 U.S.C. § 523(a)(2)(A)

Section 523(a)(2)(A) provides, that a debt will not be discharged in bankruptcy if it is "for money, property, services, or an extension, renewal, or refinancing of credit," to the extent that it was "obtained by false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A). To establish "false pretenses" or "false representations" under section 523(a)(2)(A)

8

"the creditor must show '(1) a knowing and fraudulent falsehood; (2) describing past or current facts; (3) that was relied upon by the other party.'" *Turbo Aleae Invs., Inc. v. Borschow (In re Borschow)*, 2011 Bankr. LEXIS 1332, at *44 (Bankr. W.D. Tex. Apr. 8, 2011) (quoting *RecoverEdge, LP v. Pentecost*, 44 F.3d 1284, 1292 (5th Cir. 1995)). For a debt to be deemed non-dischargeable for actual fraud a creditor must show:

> (1) that the debtor made a representation; (2) that the debtor knew the representation was false; (3) that the representation was made with the intent to deceive the creditor; (4) that the creditor actually and justifiably relied on the representation; and (5) that the creditor sustained a loss as a proximate result of its reliance.

*Gen. Elec. Capital Corp. v. Acosta (In re Acosta)*, 406 F.3d 367, 372 (5th Cir. 2005); *see also Turbo Aleae Invs., Inc. v. Borschow (In re Borschow)*, 2011 Bankr. LEXIS 1332, at *44-45 (Bankr. W.D. Tex. Apr. 8, 2011) ("'false representations and false pretenses [must] encompass statements that falsely purport to depict *current or past facts*…' However, a promise regarding a future action can still form the basis of a non-dischargeable debt under the 'actual fraud' arm of § 523(a)(2)(A) if the debtor made 'promises of future action which, *at the time they were made,* he had no intention of fulfilling.'") (citations omitted, emphasis original).

To adequately plead a section 523(a)(2)(A) cause of action, the plaintiff must plead with particularity as required by Rule 9(b) of the Federal Rules of Civil Procedure. *In re Kilroy*, 354 B.R. 476, 488 (Bankr. S.D. Tex. 2006) (section 523(a)(2)(A) claims are subject to Rule 9(b)). "In alleging fraud or mistake a party must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). Specifically, Rule 9(b) requires that the plaintiff plead enough facts to illustrate "the 'who, what, when, where, and how' of the alleged fraud." *Williams v. Bell Helicopter Textron, Inc.*, 417 F.3d 450, 453 (5th Cir. 2005) (quoting *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997)). "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id*. Rule 9(b) has been incorporated into the Bankruptcy Code as Bankruptcy Rule 7009.

The Fifth Circuit "appl[ies] Rule 9(b) to fraud complaints with 'bite' and 'without apology,' but [is] also aware that Rule 9(b) supplements but does not supplant Rule 8(a)'s notice pleading." *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 186-87 (5th Cir. 2009). "Rule 9(b) does not reflect a subscription to fact pleading and requires only simple, concise, and direct allegations of the circumstances of fraud, which after *Twombly* must make relief plausible, not merely conceivable, when taken as true." *Id*. As previously noted by this court, "[t]he law does not require that all such evidence [of fraud] be placed in the original complaint, else all complaints for fraud would necessarily fail in circumstances where the fraud perpetrator was sufficiently skillful at fraud to *hide* the evidence." *In re Hayes*, 372 B.R. 287, 289 (Bankr. W.D. Tex. 2007) (emphasis original). "The Defendant does *not* have the right to utilize a motion to dismiss . . . as a substitute for discovery." *Id*.

As noted above, Horrigan's Amended Complaint contains the following allegations with respect to her section 523(a)(2)(A) claim: 1) in the Settlement Agreement with Investment Technology Group, Wald represented that the gross proceeds to received by Pendleton was $600,000 when the actual amount received was $1,100,000; 2) as the person who negotiated the agreement, Wald knew that this representation was false; 3) Wald made the representation with the intent to deceive Horrigan with regard to her share of the settlement proceeds; 4) Horrigan justifiably relied upon Wald's false representations because she did not immediately take action to block the transaction and prevent the dissipation of the funds; and 5) Horrigan suffered damages as shown by the fact that both Wald and Pendleton have filed for chapter 7 bankruptcy without sufficient assets to satisfy Horrigan's claim.

These allegations, no matter how vigorously Wald disputes their veracity, sufficiently identify the who, what, when, where and how of Horrigan's alleged injury. This court must take Horrigan's well-pleaded allegations as true. *See Broyles*, 2010 U.S. App. LEXIS 12151, at *5. Wald relies on findings and conclusions issued by the New York District Court in an effort to negate the elements of a false representation and Horrigan's reliance thereon. This court may take judicial notice of the fact that the New York District Court made certain findings and conclusions in Horrigan's prior suit. This court may not, however, take such findings and conclusions as true. *See, e.g., Anderson v. Dallas County*, 2007 U.S. Dist. LEXIS 28702, at *9 (N.D. Tex. Apr. 18, 2007) ("The Fifth Circuit has determined that a court may take judicial notice of a "document filed in another court . . . to establish the fact of such litigation and related filings," but "cannot take notice of the factual findings of another court.") (quoting *Taylor v. Charter Med. Corp.*, 162 F.3d 827, 830 (5th Cir. Tex. 1998)); *In re FedEx Ground Package Sys.*, 2010 U.S. Dist. LEXIS 30303, at *10 (N.D. Ind. Mar. 29, 2010) ("Court documents from another case may be used to show that the document was filed, that party took a certain position, and that certain judicial findings, allegations or admissions were made …. Judicial notice generally doesn't extend to the truth of the matters that were asserted in the other judicial proceeding.") (citing *General Elec. Capital v. Lease Resolution*, 128 F.3d 1074, 1081 (7th Cir. 1997)). Although it appears to the court that Wald likely has a strong argument against finding justifiable reliance on Horrigan's part, this question will be decided at trial.

**3.** Res Judicata / Collateral Estoppel

Wald also argues that res judicata and/or collateral estoppel should be applied to bar Horrigan's section 523(a)(2)(A) claim, which Wald maintains is based on the same underlying facts as Horrigan's New York suit. Regarding *res judicata*, the Fifth Circuit has stated:

In determining whether a claim is precluded under principles of res judicata, our circuit applies the following test: 'For a prior judgment to bar an action on the basis of res judicata, the parties must be identical in both suits, the prior judgment

10

> must have been rendered by a court of competent jurisdiction, there must have been a final judgment on the merits and the same cause of action must be involved in both cases.'

*Brown v. Chesnut (In re Chesnut)*, 356 Fed. Appx. 732, 736 (5th Cir. 2009) (quoting *Nilsen v. City of Moss Point, Miss.*, 701 F.2d 556, 559 (5th Cir. 1983)). Here, *res judicata* would bar Horrigan's section 523(a)(2)(A) claim only if that cause of action was or could have been raised in the prior New York lawsuit. *See In re Paige*, 610 F.3d 865, 870 (5th Cir. 2010) (explaining that for *res judicata* to apply, a previously unlitigated claim must be one that could have been asserted in any of the prior actions). Here, Horrigan's section 523(a)(2)(A) claim could not have been brought in the New York suit; Wald had not yet filed for bankruptcy at the time of the New York litigation. There is no cause of action for a determination of nondischargeability when the party in question has not yet filed a bankruptcy case seeking a discharge. *Res judicata* thus cannot be applied here.

Regarding collateral estoppel, as explained by the Fifth Circuit in *Recoveredge, L.P. v. Pentecost*,

> Collateral estoppel depends on three elements: (1) the issue at stake must be identical to the one involved in the prior action; (2) the issue must have been actually litigated in the prior action; and (3) the determination of the issue in the prior action must have been a necessary part of the judgment in that earlier action.

44 F.3d 1284, 1290 (5th Cir. 1995). The Court continued:

> Collateral estoppel will apply in a second proceeding that involves separate claims if the claims involve the same issue, … and the subject matter of the suits may be different as long as the requirements for collateral estoppel are met. As one treatise points out, however, '[c]ourts have readily perceived that for purposes of preclusion, "[i]ssues are not identical if the second action involves application of a different legal standard, even though the factual setting of both suits be the same."'

*Id.* at 1291 (internal citations omitted); *see also Brister*, 946 F.2d at 354 n. 1 (5th Cir. 1991) (explaining that "[n]ot only the facts, but also the legal standard used to assess them, must be identical"). The Court went on to conclude that collateral estoppel applied to the non-dischargeability claim at issue in that case because the issue presented in the prior litigation (whether the Debtor participated in a fraudulent scheme) was *identical* to the issue raised in the section 523(a)(2)(A) non-dischargeability claim. *Recoveredge*, 44 F.3d at 1294-97. *See also Dennis v. Dennis (In re Dennis),* 25 F.3d 274, 278 (5th Cir. 1994) ("Collateral estoppel applies in bankruptcy courts only if, *inter alia*, the first court has made specific, subordinate, factual findings on the identical dischargeability issue in question—that is an issue which encompasses

11

the same prima facie elements as the bankruptcy issue—and facts supporting the court's findings are discernible from that court's record.").

Here, the fact that Wald's allegedly fraudulent conduct *could have* been litigated in the New York suit is not relevant to a determination of whether collateral estoppel applies; the assertion that fraud could have been raised in the prior litigation is only relevant to a determination of whether res judicata applies. As explained above, *res judicata* cannot be applied to Horrigan's non-dischargeability claim. With respect to collateral estoppel, fraud was not pleaded or addressed at all in the New York suit; that court's decision addressed only Horrigan's breach of contract claim. Accordingly, the requirement that the prior suit involve the identical issue raised in the non-dischargeability action simply has not been satisfied. Collateral estoppel cannot be applied in this case.

**4.** 11 U.S.C. § 523(a)(6)

Under section 523(a)(6), debts that were incurred through willful and malicious injury by the debtor to another entity or to the property of another entity are nondischargeable in bankruptcy proceedings under Title 11. 11 U.S.C. § 523(a)(6). "The test for willful and malicious injury under § 523(a)(6), [] is condensed into a single inquiry of whether there exists 'either an objective substantial certainty of harm or a subjective motive to cause harm' on the part of the debtor." *Berry v. Vollbracht (In re Vollbracht)*, 276 Fed. Appx. 360, 361 (5th Cir. 2007).

Claims under § 523(a)(6) are not subject to the heightened pleading standards of Rule 9(b) because section 523(a)(6) contains no mention of fraud. *In re Kilroy*, 354 B.R. 476, 489 (Bankr. S.D. Tex. 2006). Therefore, such claims must be alleged in accordance with Rule 8 of the Federal Rules of Civil Procedure. *Id*. Pleadings under Rule 8 require "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a Plaintiff's obligation to provide the 'grounds' for his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007).

Horrigan's Amended Complaint contains the following allegations with respect to her section 523(a)(6) claim:

> Wald committed willful and malicious injury against Horrigan when he misrepresented the amount received under the settlement and caused the excess proceeds owing to Horrigan to be dissipated by Pendleton and by himself. In placing such funds beyond the reach of Horrigan, Wald either acted with actual intent to harm Horrigan and/or committed any [sic] act which was substantially

12

> certain to result in harm to Horrigan. Specifically, transferring all of the assets of the corporation to third parties while obligations were outstanding to Horrigan was either intended to harm Horrigan or would necessarily have that effect.

(Compl., p. 6.) Essentially, Horrigan argues that Wald committed a willful and malicious injury by transferring and generally causing the dissipation of Pendleton funds that rightfully should have been paid to Horrigan. As an owner of Pendleton, Horrigan had an interest, per the shareholder agreement, in Pendleton's proceeds. The allegation that Wald transferred such funds beyond Horrigan's reach, with either the objective or subjective intent to harm Horrigan, is sufficient to state a claim for willful and malicious injury under section 523(a)(6). Furthermore, Horrigan's fraud allegations also support her section 523(a)(6) claim. *See FDIC v. Smith (In re Smith)*, 160 B.R. 549, 554 n. 9 (N.D. Tex. 1993) (noting that "[s]everal courts have held that fraudulent conduct can make a debt nondischargeable pursuant to § 523(a)(6)[,]" and concluding that "[sections] 523(a)(2)(A) and 523(a)(6) are not mutually exclusive").

### *Conclusion*

For the reasons stated above, the court DENIES Wald's Motion to Dismiss Horrigan's Amended Complaint. An order to this effect will be entered separately.

####